1
2
3
4

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| ESTATE OF ANDREA NAHARRO, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>COUNTY OF SANTA CLARA, et al.,<br><br>Defendants. | Case No.  14-cv-04570-BLF<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>[Re:  ECF 58] |

Plaintiffs Steven and Stacy Barnard bring this action following the fatal shooting of their sixty-one year old mother, Andrea Naharro, by a Santa Clara County Sheriff's deputy responding to a 911 call at Naharro's apartment building.  Deputies arriving at the scene saw a woman – later identified as Naharro – on the porch of the front unit, holding a knife in one hand and a guitar in the other.  Naharro immediately left the porch and moved toward the deputies, following them when they retreated and ignoring their orders to drop the knife.  She was fatally shot by Deputy Jennifer Galan when she approached Galan while raising the knife.

Plaintiffs bring suit under 42 U.S.C. § 1983, claiming that Galan's use of deadly force was excessive and violated Naharro's Fourth Amendment rights.  Plaintiffs also claim that under state law Naharro's death was the result of Galan's negligence and the County of Santa Clara is vicariously liable for Galan's negligence.  Galan and the County seek summary judgment on all claims.  For the reasons discussed below, the motion for summary judgment is GRANTED as to Plaintiffs' Fourth Amendment claim and DENIED as to Plaintiffs' wrongful death claim.

I.    FACTS[1]

Naharro resided with her husband, Camie Gionet, in a three-unit apartment building located at 95 Cleveland Avenue in San Jose, California.  Naharro and Gionet occupied Unit A, at the front of the building.  The middle unit was occupied by a woman named Emily McNaughton, and the back unit was occupied by a couple, Chris and Jackie Contreras (then Jackie Ortega).

Events Preceding 911 Call

At approximately 10:30 p.m. on the night of the shooting, Jackie Contreras saw Naharro standing outside the apartment building wearing a robe with nothing underneath and flashing her body at an empty grassy area while saying, "Do you want to see this, motherf*****?  Do you want to see this?"  Jackie Contreras Dep. 70:2-73:25, Exh. L to Pala Decl., ECF 62-2.  Jackie, who had a close relationship with Naharro and viewed her as a second grandmother, asked whether Naharro was okay.  *Id.* 23:21-24, 72:12-16.  Naharro turned and gave what Jackie described as "an evil look" with "her eyes glazed over."  *Id.* 75:4-25.  Jackie did not think Naharro recognized her, and she thought that Naharro looked "crazy," "evil," and "possessed."  *Id.* 77:3-23.  When Jackie got back to her apartment, she and Chris locked and dead bolted the door.  *Id.* 81:4-16.  Jackie was concerned because Naharro had a key to their apartment.  *Id.* 81:11-13.

Shortly after that, Jackie and Chris heard Naharro and Gionet yelling, sounds of crashing and breaking, and Naharro's voice calling for the dog that belonged to Jackie and Chris.  Jackie Contreras Dep. 82:1-83:10, Exh. L to Pala Decl., ECF 62-2.  Jackie and Chris peeked out their front door and saw Naharro in the driveway yelling at Gionet, whom she did not appear to recognize, as he drove away.  *Id.* 88:2-89:1.  Jackie noticed that Naharro was carrying Gionet's guitar and that it had been broken, and she realized that one of the sounds she had heard earlier had been Naharro smashing the guitar.  *Id.* 89:14-92:6.  Jackie pulled Chris back into their apartment and they not only locked the door but also barricaded it with furniture.  *Id.* 92:22-93:23.[2]

---

[1] The facts set forth in this section are undisputed unless otherwise noted.

[2] Plaintiffs' relevance objection to the Contreras's testimony is OVERRULED.  Plaintiffs argue that Defendants must demonstrate that Galan's use of deadly force was objectively reasonable

United States District Court
Northern District of California

Emily McNaughton, the occupant of the middle unit, also heard yelling and sounds of things slamming and breaking.  McNaughton Dep. 43:18-44:5, Exh. K to Pala Decl., ECF 62-1. Most of the yelling was indistinct, but McNaughton heard Naharro yell that "she couldn't believe that he had bought Sudafed in her name."  *Id.* 43:2-3.  McNaughton later opened her front door a crack and saw Naharro outside smashing a guitar on the fence.  *Id.* 47:6-48:25.[3]

###### 911 Call and Deputies' Response

Eventually, Jackie and Chris decided to call 911, and Chris did so shortly after midnight. Chris Contreras Dep. 63:14-21, Exh. M to Pala Decl., ECF 62-3; 911 Call Tr. 1:5-2:3, Exh. N to Pala Decl., ECF 62-4.  Initially, Chris reported that someone was breaking into the middle unit – Unit B – at 95 Cleveland Avenue.  911 Call Tr. 1:5-2:3, Exh. N to Pala Decl., ECF 62-4.  After the dispatcher indicated that deputies were on their way, Chris said that the person he was calling about was a woman named Andrea who lived in the front unit, was in her 70s, was outside shouting, and was "going nuts."  *Id.* 2:15-3:21.

The dispatcher notified officers of "[s]uspicious circ., Cleveland at Olive, possible 459."

---

under the totality of circumstances *known to her*, and that Naharro's conduct prior to Galan's arrival cannot inform that inquiry.  *See Graham v. Connor*, 490 U.S. 386, 396 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."); *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 632 (2013) (same) (quoting *Graham*).  In the Court's view, evidence that Jackie, who viewed Naharro as a second grandmother, perceived Naharro to be a threat is relevant to show that Galan also reasonably perceived Naharro to be a threat only hours later.

[3] In addition to the neighbors' testimony regarding Naharro's conduct on the night of the shooting, Defendants offer a transcript of Gionet's interview with law enforcement officers the day after the shooting.  *See* Gionet Interview, Exh. D to Leon Decl., ECF 60-4.  The interview transcript is offered in lieu of deposition testimony because Gionet died before his deposition could be taken. Plaintiffs' hearsay objection to the interview transcript is SUSTAINED.  Defendants concede that the transcript is hearsay, but they argue that the Court may consider it under Federal Rule of Evidence 807, which provides that a hearsay statement need not be excluded if:  (1) the statement has circumstantial guarantees of trustworthiness; (2) it is offered as evidence of a material fact; (3) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and (4) admitting it will best serve the purposes of the federal rules and the interests of justice.  Defendants have not cited, and the Court has not discovered, any authority for the proposition that Gionet's account of Naharro's conduct is trustworthy simply because it was made in the course of a police interview.  Accordingly, the Court concludes that Rule 807 does not apply.  Moreover, Defendants offer other testimony, most notably that of Naharro's neighbor Jackie Contreras, to illustrate the oddity of Naharro's behavior in the hours before she was shot.  Gionet's description of similarly odd behavior would be cumulative.

Dispatch Tr. 2:3-4, Exh. O to Pala Decl., ECF 62-5.  The dispatcher went on to state "at 95 Cleveland, 95 Cleveland at Olive, the middle unit B, Bravo.  RP thinks someone is possibly breaking into that house.  Hears glass breaking and pounding."  *Id.* 2:6-8.  After several officers acknowledged and indicated that they were responding, the dispatcher added "and there should be a lady yelling out in front."  *Id.* 2:9-21.

Deputies Jennifer Galan, Fernando Espinosa, and Joseph Brown arrived at the scene separately and parked their cars on Cleveland Avenue.  Galan Dep. 114:25-115:24, 126:25-127:4, Exh. P to Pala Decl., ECF 62-6.  Reserve Deputy Bob Luong arrived shortly afterward and parked at the corner of Cleveland Avenue and Olive Street.  Luong Dep. 54:22-55:7, Exh. Q to Pala Decl., ECF 62-7.  The deputies did not use their headlights or emergency lighting because they did not want to alert the suspect if there was a crime in progress.  Brown Dep. 39:3-20, 43:15-22, Exh. 4 to Snell Decl., ECF 65-2.  Because Cleveland Avenue is located in an unincorporated area of San Jose, it does not have streetlights on every block.  Tong Decl. 29:17-30:15, Exh. 10 to Snell Dep., ECF 65-3.  As a result, the street was quite dark.  *Id.*  However, as Galan parked across the street from 95 Cleveland Avenue, she could see a woman crouched on the porch near the open door of the front unit.  Galan Dep. 108:11-20, Exh. 5 to Snell Decl., ECF 65-2.  The woman was illuminated by a porch light and by light coming from inside the apartment.  *Id.*

As Galan, Espinosa, and Brown approached the woman – later identified as Naharro – she stood up, stepped off the porch, and moved toward the deputies.  Galan Dep. 126:22-127:23, Exh. P to Pala Decl., ECF 62-6.  The woman was carrying a guitar in one hand and a knife in the other.  Brown Dep. 50:8-22, Exh. R to Pala Decl., ECF 62-8.  Brown called out that the suspect had a knife.  Galan Dep. 127:21-23, Exh. P to Pala Decl., ECF 62-6; Brown Dep. 54:8-10, Exh. R to Pala Decl., ECF 62-8.  According to the property report prepared after the incident, the knife was 10.5 inches long with a black plastic handle and a 5.26 inch silver blade.  Property Report, Exh. 2 to Jason Brown Dep., Exh. 2 to Snell Decl., ECF 65-2.  When Brown called out the existence of the knife, both Galan and Brown drew their firearms.  Galan Dep. 127:24, Exh. P to Pala Decl., ECF 62-6; Brown Dep. 53:2-7, Exh. R to Pala Decl., 62-8.  All three deputies testified that they identified themselves by yelling "Sheriff's office" and that they repeatedly yelled at the suspect to

drop the knife.  Galan Dep. 129:11-20, Exh. P to Pala Decl., ECF 62-6; Brown Dep. 54:1-16, Exh. R to Pala Decl., 62-8; Espinosa Dep. 96:3-19, Exh. S to Pala Decl, ECF 70-1.

Plaintiffs dispute the deputies' assertions that they identified themselves as law enforcement and gave multiple orders to drop the knife.  Plaintiffs point to McNaughton's testimony that although she was standing just inside her open apartment door, she did not hear anyone say "Sheriff's office."  McNaughton Dep. 65:14-16, Exh. 12 to Snell Decl., ECF 65-3.  McNaughton heard only one order to drop the knife, a woman's voice saying "[p]ut the knife down" only a second before shots were fired.  *Id.* 53:6-20.  However, Espinosa keyed his radio right after Brown called out that the suspect had a knife, and the dispatch recording captured him saying "drop the knife."  Espinosa Dep. 96:7-16, Exh. S to Pala Decl, ECF 70-1; Dispatch Tr. 3:3, Exh. O to Pala Decl., ECF 62-5.  Thus although it is unclear from this record whether the deputies identified themselves as law enforcement, the undisputed evidence establishes that Naharro was ordered to drop the knife at least twice.

When Naharro moved toward the deputies, they began retreating.  Brown backed up the sidewalk, going north, while Galan and Espinosa backed up into the street and then turned north to track Brown and Naharro.  Galan Dep. 136:4-137-8:24, Exh. 5 to Snell Decl., ECF 65-2.  Naharro followed Brown on the sidewalk at a pace that Galan described as somewhere between a walk and a run.  *Id.* 140:22-25.  Brown perceived Naharro to be chasing him, and he cut through a space between two parked cars and reversed direction, running south on Cleveland Avenue and eventually taking cover behind a parked car.  *Id.* 141:2-23; Brown Dep. 56:11-67:18, Exh. R to Pala Decl., ECF 62-8.  Brown stayed behind the car throughout the remainder of the incident, and he did not see Naharro again before the shooting.  Brown Dep. 68:12-69:12, Exh. R to Pala Decl., ECF 62-8.

Naharro turned and followed Brown south on Cleveland, which meant that she was walking back toward Galan and Espinosa.  Galan Dep. 152:1-12, Exh. 5 to Snell Decl., ECF 65-2.  Galan and Espinosa began backing up and then got separated.  *Id.* 152:17-154:16.  Espinosa ended up near the rear bumper of a red sedan, which was one of three vehicles parked in the driveway of Naharro's apartment building, while Galan ended up in the driveway itself.  Galan Dep. 154:17-

23, Exh. 5 to Snell Decl., ECF 65-2; Espinosa Dep. 112:12-113:15, Exh. 7 to Snell Decl., ECF 65-3. Naharro moved toward Galan, who backed up the driveway. Galan described Naharro as "aggressing" toward her, and Espinosa stated that Naharro "came at" Galan. Galan Dep. 155:1-8, Exh. 5 to Snell Decl., ECF 65-2; Espinosa Dep. 116:20, Exh. 7 to Snell Decl., ECF 65-3. Galan testified that she was concerned about running out of room as she backed up the driveway. Galan Dep. 158:8-159:8, Exh. 5 to Snell Decl., ECF 65-2. She knew that there were objects in the driveway, and stairs, and she did not know how far she could continue up the driveway without hitting something. *Id.* Galan testified that Naharro approached to within about four feet of her and raised the knife "to chest level blade pointing toward me." Galan Dep. 163:11-164:12, Exh. P to Pala Decl., ECF 62-6. Galan fired three shots, striking Naharro in the face, chest, and abdomen. *Id.* 164:17-18, 188:5-7; O'Hara Dep. 26:7-31:17, Exh. 14 to Snell Decl., ECF 65-3. Naharro died as a result of the bullet wounds. O'Hara Dep. 69:25-70:9, Exh. 14 to Snell Decl., ECF 65-3. The entire incident, from the deputies' arrival to the shooting, lasted approximately forty-four seconds. Galan Dep. 24:1-4, Exh. 5 to Snell Decl., ECF 65-2.

Plaintiffs dispute Defendants' version of events, asserting that Naharro actually dropped the knife when first ordered to do so, did not chase the deputies but instead "wandered" in their direction, and was merely trying to return to her apartment when she was intercepted in the driveway by Galan. Plaintiffs' theory is that Naharro was not threatening Galan at the time of the shooting, but that Galan simply shot Naharro from the side as Naharro walked toward her apartment. Plaintiffs' bases for this theory are discussed below.

Plaintiffs' Claims

The operative second amended complaint ("SAC") filed by Plaintiffs Steven and Stacy Barnard, acting individually and as representatives of Naharro's estate, allege the following claims against Galan and the County: § 1983 claims for violation of Naharro's Fourth and Fourteenth Amendment rights; a claim under the Americans with Disabilities Act ("ADA"); a wrongful death claim under California law; and a claim under California's Bane Act. *See* SAC, ECF 31. Plaintiffs have stipulated to dismissal of their ADA claim, *see* Stipulation and Order Regarding Second Amended Complaint, ECF 44, and have chosen not to oppose the summary judgment

motion with respect to their § 1983 claims for violation of Naharro's Fourteenth Amendment

rights, their § 1983 claim against the County for violation of Naharro's Fourth Amendment rights,

and their Bane Act claim, *see* Pls.' Opp. at 1 n.1, ECF 65.  Thus the only claims remaining for

consideration on Defendants' motion are the § 1983 claim against Galan for violation of Naharro's

Fourth Amendment rights; the wrongful death claim against Galan based upon Galan's asserted

negligence; and the wrongful death claim against the County under a theory of vicarious liability.

Galan and the County seek summary judgment as to all of those claims.

## II.     LEGAL STANDARD

"A party is entitled to summary judgment if the 'movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *City of*

*Pomona v. SQM North America Corp.*, 750 F.3d 1036, 1049 (9th Cir. 2014) (quoting Fed. R. Civ.

P. 56(a)).  Material facts are those that may affect the outcome of the case.  *Anderson v. Liberty*

*Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

sufficient evidence for a reasonable jury to return a verdict for the non-moving party. *Id*. at 248-

49.

The party moving for summary judgment bears the initial burden of informing the court of

the basis for the motion, and identifying portions of the pleadings, depositions, answers to

interrogatories, admissions, or affidavits which demonstrate the absence of a triable issue of

material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  To meet its burden, "the

moving party must either produce evidence negating an essential element of the nonmoving

party's claim or defense or show that the nonmoving party does not have enough evidence of an

essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins.*

*Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

If the moving party meets its initial burden, the burden shifts to the non-moving party to

produce evidence supporting its claims or defenses.  *Nissan*, 210 F.3d at 1103.  If the non-moving

party does not produce evidence to show a genuine issue of material fact, the moving party is

entitled to summary judgment.  *Celotex*, 477 U.S. at 323.  "The court must view the evidence in

the light most favorable to the nonmovant and draw all reasonable inferences in the nonmovant's

United States District Court
Northern District of California

favor." *City of Pomona*, 750 F.3d at 1049.  However, "the 'mere existence of a scintilla of evidence in support of the plaintiff's position'" is insufficient to defeat a motion for summary judgment. *Id.* (quoting *Anderson*, 477 U.S. 242, 252 (1986).  "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'"  *Id.* (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

## III.   DISCUSSION

### A.   Fourth Amendment Claim

Plaintiffs claim that Galan's use of deadly force was excessive, in violation of Naharro's Fourth Amendment rights.  The Court concludes that even viewing the evidence in the light most favorable to Plaintiffs and drawing all reasonable inferences in their favor, Galan is entitled to qualified immunity on the Fourth Amendment claim.  A government official sued under § 1983 is entitled to qualified immunity unless the plaintiff shows that (1) the official violated a statutory or constitutional right, and (2) the right was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 134 S.Ct. 2012, 2023 (2014) (citing *Ashcroft v. al–Kidd*, 131 S.Ct. 2074, 2080 (2011)).  As discussed below, Defendants have demonstrated that on the first prong of the qualified immunity analysis, no rational trier of fact could find that Galan's use of deadly force violated Naharro's Fourth Amendment rights.  Having reached this conclusion, the Court need not address the second prong of the qualified immunity analysis.[4]

As discussed above, the first prong of the qualified immunity analysis focuses on whether the defendant official violated a statutory or constitutional right.  Here, Plaintiffs claim that Galan's use of deadly force violated Naharro's Fourth Amendment rights.  The Fourth Amendment "guarantees citizens the right to be secure in their persons . . . against unreasonable

---

[4] The Court notes that Defendants frame the issues slightly differently, asserting first that there was no constitutional violation and second that even if there were, Galan is entitled to qualified immunity.  *See* Defs.' MSJ at 10-19, ECF 58.  In Fourth Amendment unreasonable force cases, the inquiry on the first prong of the qualified immunity analysis is the same as the inquiry made on the merits.  *Scott v. Henrich*, 39 F.3d 912, 914-15 (9th Cir. 1994).  Consequently, Defendants' arguments and evidence regarding the merits of Plaintiffs' Fourth Amendment claim properly are addressed in the context of Galan's entitlement to qualified immunity.

8

. . . seizures of the person." *Graham v. Connor,* 490 U.S. 386, 394 (1989) (internal quotation marks omitted) (alteration in original).  The "reasonableness" of a particular seizure depends on how it was carried out.  *Id.* at 395.  "[A]ll claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Id.*

The Supreme Court has explained that when evaluating an excessive force claim, the relevant question is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham,* 490 U.S. at 397.   This inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* at 396 (internal quotation marks and citation omitted).  "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Id.* at 396-97.  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396 (internal quotation marks and citation omitted).

The Ninth Circuit has articulated a three-step approach to *Graham* balancing.  *See Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011).  First, the court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Id.* (internal quotation marks and citation omitted).  Second, the court must "evaluate the government's interest in the use of force." *Id.*  Finally, the court must "balance the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (internal quotation marks and citation omitted).

With respect to the first step, the severity of the intrusion, there is no dispute that Galan used deadly force which resulted in Naharro's death.  "The intrusiveness of a seizure by means of deadly force is unmatched." *A. K. H by & through Landeros v. City of Tustin*, --- F.3d ----, 2016

United States District Court
Northern District of California

United States District Court
Northern District of California

WL 4932330, at *4 (9th Cir. Sept. 16, 2016) (internal quotation marks and citation omitted).  "The use of deadly force implicates the highest level of Fourth Amendment interests both because the suspect has a fundamental interest in his own life and because such force frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment."  *Id.* (internal quotation marks and citation omitted).  The present motion therefore turns on Defendants' showing with respect to the second and third steps of the *Glenn* framework.

With respect to the second step, "[t]he strength of the government's interest in the force used is evaluated by examining three primary factors:  (1) 'whether the suspect poses an immediate threat to the safety of the officers or others,' (2) 'the severity of the crime at issue,' and (3) 'whether he is actively resisting arrest or attempting to evade arrest by flight.'  *Glenn*, 673 F.3d at 872 (quoting *Graham*, 490 U.S. at 396).  These factors are not exclusive and must be considered in light of the totality of the circumstances.  *Id.*  The most important factor in determining the government's interest is whether the suspect poses an immediate threat to officer safety or to others.  *Id.*

Finally, with respect to the third step, the case law is clear that when the suspect poses a significant threat of death or serious physical injury to the officer or others, the government's interest in the use of deadly force outweighs even the severest intrusion on the suspect's Fourth Amendment rights.  *See, e.g., City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765, 1775 (2015) (officers' use of deadly force was reasonable to defend against woman approaching to within a few feet of them with knife); *Gonzalez v. City of Anaheim*, 747 F.3d 789, 793 (9th Cir. 2014) ("An officer's use of deadly force is reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."); *Scott v. Henrich*, 39 F.3d 912, 914 (9th Cir. 1994) (same).

### 1.    Defendants' Evidence

As the moving parties, Defendants have the initial burden to produce evidence negating an essential element of Plaintiffs' Fourth Amendment claim or to show that Plaintiffs do not have enough evidence of an essential element of that claim to carry their ultimate burden of persuasion at trial.  *See Nissan*, 210 F.3d at 1102.  Under the standards articulated above, Defendants may

United States District Court
Northern District of California

1    satisfy this burden by showing that at the time of the shooting there was probable cause to believe

2    that Naharro posed a serious threat of death or serious physical injury to Galan or others.

3          Defendants submit Galan's testimony that she used deadly force because Naharro was

4    advancing on her, had closed within a few feet of her, had not dropped the knife when ordered to

5    do so, and had raised the knife.  Galan Dep. 155:1-21, 161:17-18, 163:11-21, Exh. P to Pala Decl.,

6    ECF 62-6.  Galan also testified that she was concerned about running out of room as she backed

7    up the driveway.  Galan Dep. 158:8-159:8, Exh. 5 to Snell Decl., ECF 65-2.  Galan did not realize

8    that she could have escaped from the driveway by going around a red sedan parked there.  *Id.*

9    162:1-23.  She thought she was trapped.  *Id.*  This evidence is sufficient to show that it was

10   objectively reasonable for Galan to believe that Naharro posed a serious threat of injury to her.

11         In reaching this conclusion, this Court finds guidance in *Sheehan*, in which the Supreme

12   Court addressed an excessive force claim arising from the shooting of a mentally ill woman

13   brandishing a knife.  *See City and Cnty. of San Francisco v. Sheehan*, 135 S. Ct. 1765 (2015).

14   Two police officers entered Sheehan's room at a group home in response to a report that she had

15   threatened to kill her social worker.  *Id.* at 1770.  Sheehan grabbed a kitchen knife and threatened

16   to kill the officers, at which point they retreated to the hallway.  *Id.*  The officers then drew their

17   weapons and reentered the room after agreeing that one would push the door open while the other

18   pepper sprayed Sheehan.  *Id.* at 1771.  Sheehan did not drop the knife and, when she was only a

19   few feet away, both officers shot her.  *Id.*  The Supreme Court held that the officers' use of force

20   was reasonable, noting that at the time shots were fired Sheehan was only a few feet from one of

21   the officers, who was "cornered."  *Id.* at 1775.  The Supreme Court concluded that "[n]othing in

22   the Fourth Amendment barred [the officers] from protecting themselves, even though it meant

23   firing multiple rounds."  *Id.*  Similarly, in the present case and based upon Defendants' evidence,

24   nothing in the Fourth Amendment barred Galan from firing to protect herself from attack by a

25   woman armed with a knife.

26         Plaintiffs distinguish *Sheehan* on the basis that Sheehan verbally threatened to kill a social

27   worker and two officers, and picked up the knife when officers entered her room.  In contrast,

28   Naharro made no verbal threats and already had the knife in her hand when deputies arrived at her

11

United States District Court
Northern District of California

residence.  While those factual differences do exist, they do not undermine application of the Supreme Court's holding, which was based on Sheehan's proximity to a "cornered" officer while wielding a knife.  *See Sheehan*, 135 S. Ct. at 1775.

This Court is mindful of the Ninth Circuit's admonition that in deadly force cases "the court may not simply accept what may be a self-serving account by the police officer."  *Scott*, 39 F.3d at 915.  Defendants submit other evidence to corroborate Galan's testimony, including the testimony of Deputy Espinosa, who testified that Naharro was within four or five feet of Galan while holding the knife out in front of her when the shots were fired.  Espinosa Dep. 140:22-141:12, Exh. S to Pala Decl., ECF 170-1.  In addition, Defendants' forensics expert, William Matty, opines that the location of the three fired cartridge casings, as well as gunshot residue analysis, are consistent with the testimony of the deputies who were at the scene.  Matty Decl., ECF 61.[5]  Finally, Galan's testimony that Naharro was coming at her with a knife is supported by the testimony of Naharro's neighbor, McNaughton, who heard a woman's voice saying "[p]ut the knife down" only a second before shots were fired.  McNaughton Dep. 53:6-20, Exh. 12 to Snell Decl., ECF 65-3.

The Court concludes that this evidence is sufficient to satisfy Defendants' initial burden of showing that at the time of the shooting, there was probable cause to believe that Naharro posed a serious threat of death or severe physical injury to Galan.

### 2.       Plaintiffs' Evidence

Because Defendants have met their initial burden, the burden shifts to Plaintiffs to show the existence of disputed facts material to the issue of whether Galan's use of deadly force was objectively reasonable.  Plaintiffs attempt to meet this burden by arguing that a number of circumstances surrounding the shooting do not support a finding of reasonableness.  The Court addresses those arguments in the order set forth in Plaintiffs' brief.

---

[5] Plaintiffs object to Matty's opinions under Federal Rule of Evidence 403, asserting that the validity of ejection pattern analysis has been brought into question by multiple studies.  However, in support of that objection, Plaintiffs rely on a single 2010 article published in Investigative Sciences Journal.  The article does not provide a sufficient basis for excluding Matty's opinion.  Plaintiffs' objection on this basis is OVERRULED.

### a.      Severity of the Crime

First, Plaintiffs argue that the crime to which the deputies were responding – a possible burglary – was not severe.  They rely on Roger Clark, an expert in police practices, who opines that because "[t]he crime, if any, was minor and was not in progress," the use of deadly force was not warranted.  Clark Decl. ¶ 16, ECF 65-4.[6]  Clark ignores the fact that threatening another with a knife constitutes assault with a deadly weapon under California law.  *See* Cal. Pen. Code § 245 (assault with a deadly weapon); *Hockenberry v. United States*, 422 F.2d 171, 173 (9th Cir. 1970) (knife is a deadly weapon under § 245).  Therefore, unless Plaintiffs can demonstrate a factual dispute as to whether Naharro chased the deputies while holding a knife and/or as to whether she raised the knife toward Galan, Clark's opinion on this point is without factual basis.

### b.      Serious Threat

Second, Plaintiffs argue that there are genuine issues of material fact as to whether Naharro posed a serious threat to Galan or others.  Plaintiffs claim that a rational jury viewing the evidence in this case could find that Naharro dropped the knife when first ordered to do so and therefore did not have it at the time of the shooting; did not chase the deputies but instead merely "wandered" in their direction; was as much as thirty-five feet away from Galan at the time of the shooting, and was simply returning to her apartment when she was shot from the side by Galan.  Having reviewed the evidence, the Court concludes that no rational jury could make any of these findings on this record.

With respect to Naharro's possession of the knife, both Galan and Espinosa testified that they saw the knife in Naharro's hand just before the shooting.  Galan Dep. 163:11-21, Exh. P to Pala Decl., ECF 62-6  Espinosa Dep. 140:22-141:12, Exh. S to Pala Decl., ECF 170-1.  Moreover, McNaughton testified that she heard a woman's voice saying "Put the knife down" only one second before shots were fired.  McNaughton Dep. 53:6-20, Exh. 12 to Snell Decl., ECF 65-3.

To counter this evidence, Plaintiffs argue that "[w]itnesses describe the area as 'pitch

---

[6] Defendants object to Clark's declaration under Federal Rules of Evidence 401, 403, 702, and 703 in a single sentence string-citing the above rules without explaining how each applies and what portion of Clark's declaration are challenged.  Because Defendants have failed to make clear the bases and nature of their objections, the objections to the Clark declaration are OVERRULED.

United States District Court
Northern District of California

1    black." Pls.' Opp. at 18, ECF 65. Plaintiffs ask the Court to draw the inference that it was too

2    dark for Deputies Galan and Espinosa to see a knife in Naharro's hand. Plaintiffs ignore Galan's

3    testimony that at the time she fired her weapon, there was sufficient lighting for her to see behind

4    Naharro to confirm that Espinosa was not in her "backdrop." Galan Dep. 165:5-11, Exh. P to Pala

5    Decl., ECF 62-6. Galan also testified that even before she exited her car, she could see Naharro on

6    the front porch of the apartment building because of the illumination from a porch light and the

7    light spilling out of Naharro's open apartment door. Galan Dep. 108:11-20, Exh. 5 to Snell Decl.,

8    ECF 65-2. Plaintiffs' argument also does not address Galan's undisputed callout to Naharro to

9    drop the knife a second before she fired on Naharro. That callout, as evidenced by McNaughton's

10   testimony, corroborates the deputies' after-the-fact testimony that they saw Naharro approaching

11   Galan with the knife in her hand. *See* McNaughton Dep. 53:6-20, Exh. 12 to Snell Decl., ECF 65-

12   3.

13           Plaintiffs also argue that Naharro could not have been holding the knife in her right hand

14   when she was shot because the knife ended up on the ground to the left of her body. *See* Pls.'

15   Opp. at 11, ECF 65. Defendants' motion does not focus on which hand Naharro used to hold the

16   knife, and Plaintiffs do not cite to any testimony in which Galan or the other deputies stated that

17   Naharro carried the knife in her right hand. Even had Plaintiffs cited to such testimony, the fact

18   that the knife was found to the left of Naharro's body, without more, would be insufficient to

19   create a disputed issue as to whether Naharro was holding the knife at the time of the shooting. *Cf.*

20   *MacEachern v. City of Manhattan Beach*, 623 F. Supp. 2d 1092, 1104 (C.D. Cal. 2009)

21   (speculation that individual would not have held the knife in his non-dominant hand and failure to

22   identify latent prints on the knife were insufficient to create a disputed issue as to whether the

23   individual possessed the knife).

24           Plaintiffs' contention that Naharro did not chase the deputies, but merely "wandered in the

25   direction of the deputies in the near pitch black," Pls.' Opp. at 16, also is insufficient to counter

26   Defendants' evidence that Naharro came at Galan with a knife in the moment before the shooting.

27   As discussed at length above, Galan, Espinosa, and Brown all testified that Naharro chased them,

28   moving at a brisk pace. Plaintiffs do not cite any evidence to the contrary but rely on sheer

14

1    speculation and attorney argument.

2          Likewise unavailing is Plaintiffs' assertion that "[i]nconsistencies in Deputy Galan's own

3    testimony create a material dispute as to whether she was 35 feet, 18.32 feet, or 4 feet from Ms.

4    Naharro when she shot her." Pls.' Opp. at 18, ECF 65. As an initial matter, Plaintiffs' assertion is

5    unaccompanied by any citations to evidence. *See id.* To the extent that Plaintiffs expect the Court

6    to comb through Plaintiffs' statement of facts in search of references to the claimed

7    inconsistencies in Galan's testimony, "it is not a court's task 'to scour the record in search of a

8    genuine issue of triable fact.'" *Moore v. City of Berkeley*, No. C14-00669 CRB, 2016 WL

9    6024530, at *3 (N.D. Cal. Oct. 14, 2016) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.

10   1996). The Court nonetheless has examined the excerpts of Galan's testimony submitted by the

11   parties, and it concludes that although Galan's testimony demonstrates uncertainty regarding the

12   precise location of items in the driveway, her testimony is consistent with respect to Naharro's

13   proximity at the time of the shooting. Moreover, Galan's testimony regarding Naharro's

14   proximity at the time of the shooting is corroborated by Defendants' forensics expert, William

15   Matty, who opines that the location of the three fired cartridge casings, as well as gunshot residue

16   analysis, are consistent with that testimony. Matty Decl., ECF 61.

17         Finally, Plaintiffs suggest that Galan shot Naharro from off to the side while Naharro was

18   returning to her apartment. The Court finds no support in the record for that assertion. Plaintiffs

19   argue, without citation to specific evidence, that "Dr. O'Hara's testimony establishes that Ms.

20   Naharro was not facing Deputy Galan when she shot her." Pls.' Opp. at 18, ECF 65. Dr. O'Hara,

21   who performed an autopsy on Naharro, testified that the bullet which entered Naharro's face

22   entered to the right of midline and traveled to the left of midline. O'Hara Dep. 29: 15-21, Exh. 14

23   to Snell Decl., ECF 65-3. This evidence is insufficient to support Plaintiffs' theory regarding the

24   shooting. Dr. O'Hara testified explicitly that he could not determine based upon the wounds

25   "how the body was positioned versus how a shooter was positioned because there could be a

26   thousand ways to obtain this trajectory. *Id.* 28:1-6. Dr. O'Hara testified that "speculation about

27   how the body is positioned is someone else's job." *Id.* 28:8-9.

28

United States District Court
Northern District of California

15

1

United States District Court
Northern District of California

c.        **Actively Resisting or Evading Arrest**

Plaintiffs argue that nothing in the record establishes that Naharro was actively resisting or evading arrest.  While this appears to be true, it does not undermine Defendants' evidence that Galan objectively had probable cause to fear for her life at the time of the shooting.  As discussed above, Naharro's demeanor and conduct only hours before the shooting were so frightening her close friend Jackie Contreras that Contreras barricaded herself into her apartment.  That evidence is consistent with the testimony of all three deputies that they perceived Naharro as a threat.

d.        **Alternative Means of Subduing Naharro**

Plaintiffs contend that Galan, Espinosa, and Brown could have used less lethal options to subdue Naharro.  Even assuming that the deputies could have marshaled less lethal options in the forty-four seconds between their arrival and the shooting, the Ninth Circuit has made clear that for Fourth Amendment purposes officers "need not avail themselves of the least intrusive means of responding to an exigent situation; they need only act within the range of conduct we identify as reasonable." *Scott*, 39 F.3d at 915.

e.        **Failure to Warn of Intent to Shoot**

It is undisputed that Galan did not warn Naharro of her intent to shoot if Naharro did not drop the knife.  Plaintiffs argue that this omission weighs against a finding that Galan's use of deadly force was reasonable, citing *Deorle v. Rutherford* for the proposition that "such warnings should be given, when feasible, if the use of force may result in serious injury."  *Deorle v. Rutherford*, 272 F.3d 1272, 1284 (9th Cir. 2001).  "[T]he giving of a warning or the failure to do so is a factor to be considered in applying the *Graham* balancing test."  *Id.*

Plaintiffs have not presented evidence that giving a warning was feasible in this case, in which Galan and the other deputies spent the entire forty-four seconds of the incident being chased by, or hiding from, Naharro.  The record evidence shows that Galan backed up the driveway ahead of a quickly moving Naharro, and that Naharro closed the distance between them while raising the knife.  Based on McNaughton's testimony, discussed above, Galan told Naharro to drop the knife immediately before shooting.  Under these circumstances, no rational trier of fact could conclude that Galan's failure to issue a verbal warning that she would shoot if the knife was not dropped

rendered the use of deadly force unreasonable.

**f.      Knowledge that Naharro was Emotionally Disturbed**

Plaintiffs argue that Galan knew that Naharro was emotionally disturbed and cite *Glenn* for the proposition that Naharro thus was entitled to special care.  In *Glenn*, officers responded to a 911 call from a mother seeking help with her intoxicated and suicidal eighteen-year old son, Lukus.  *Glenn v. Washington Cnty,* 673 F.3d 864, 866 (9th Cir. 2011).  When the officers arrived, Lukus was in the driveway holding a pocketknife to his own neck.  *Id.* at 868.  He was not threatening anyone else.  *Id.*  The officers drew their weapons and aimed them at Lukus while screaming for him to drop the knife or be killed.  *Id.*  Lukus may not have understood those commands because he was intoxicated and there was so much yelling.  *Id.*  Within four minutes of arriving at the scene, officers shot Lukas both with a non-lethal beanbag shotgun and with their service weapons, killing him.  *Id.* at 869.  The Ninth Circuit reversed the district court's grant of summary judgment for defendants, holding that there were disputed issues whether Lukus posed an immediate safety risk to others and thus whether lethal force was reasonable.  *Id.* at 879.  The court observed that "[e]ven when an emotionally disturbed individual is acting out and inviting officers to use deadly force, the governmental interest in using such force is diminished by the fact that the officers are confronted, not with a person who has committed a serious crime against others, but with a mentally ill individual."  *Id.* at 876.

The present case is factually distinguishable from *Glenn*.  First, the Court is not persuaded that a rational jury could conclude, based on the evidence presented by Plaintiffs, that Galan knew that Naharro was emotionally disturbed.  Plaintiffs rely on Galan's statements during a police interview after the incident that, "I don't think she, I don't believe that she was of sound mind, though.  I don't think that she heard anything that we are saying.  She's, nothing appeared to register."  Interview at 81:10-13, Exh. 6 to Snell Decl., ECF 65-2.  This lay characterization of Naharro's mental state, which was based upon an interaction of less than a minute, is insufficient to establish that Galen had any real knowledge of Naharro's mental state.  This case thus presents a very different factual scenario than did *Glenn*, in which officers were informed that Lukus was intoxicated and suicidal.  Second, and more importantly, whereas in *Glenn* Lukus did not pose a

United States District Court
Northern District of California

1    threat to officers or others, the evidence in the present case establishes that Naharro did present a

2    serious threat to Galan.  The Supreme Court made clear in *Sheehan* that when an officer

3    reasonably is in fear for his life, he may use deadly force even against an individual known to be

4    mentally ill.  *See Sheehan*, 135 S. Ct. at 1775.  Here, Defendants have presented unrebutted

5    evidence that Naharro raised a knife toward Galan while coming toward her at a fast pace.

6    Consequently, even if Galan had determined at some point during the forty-four second incident

7    that Naharro had mental health issues, such a determination would not undermine the

8    reasonableness of deadly force.

9                            **g.      Violations of General Police Practices and Standards**

10           Plaintiffs submit the declaration of their expert in police procedure, Roger Clark, who

11   opines that Galan failed to conform to police practices and standards in a number of ways,

12   including failing to de-escalate the situation, failing to use adequate lighting, and failing to gain

13   time and distance from Naharro so that less-lethal means of subduing her could be found.  Clark

14   Decl. ¶ 20, ECF 65-4.  Clark concludes that Galan's conduct, along with that of Espinosa and

15   Brown, "fell below general police practices, and provoked a dangerous situation such that Deputy

16   Galan used excessive force when she would not have needed to do so had her actions complied

17   with the general police practices and standards."  *Id.* ¶ 21.

18           An officer's failure to conform to professional standards is insufficient to render her liable

19   under the Fourth Amendment.  *Billington v. Smith*, 292 F.3d 1177, 1190 (9th Cir. 2002).  "The

20   Fourth Amendment's 'reasonableness' standard is not the same as the standard of 'reasonable

21   care' under tort law, and negligent acts do not incur constitutional liability."  *Id.*  "Thus even if an

22   officer negligently *provokes* a violent response, that negligent act will not transform an otherwise

23   reasonable subsequent use of force into a Fourth Amendment violation."  *Id.*  However, if the

24   officer's provocation is, itself, an independent constitutional violation, "that provocation may

25   render the officer's otherwise *reasonable* defensive use of force *unreasonable*."  *Id.*  "In such a

26   case, the officer's initial unconstitutional provocation, which arises from intentional or reckless

27   conduct rather than mere negligence, would proximately cause the subsequent application of

28   deadly force."  *Id.* at 1191.

1    Clark's declaration does not suggest that Galan's asserted negligence rose to the level of

2    intentional or reckless conduct that itself constitutes an independent constitutional violation.  Thus

3    Clark's opinion that Galan acted negligently and provoked a dangerous situation that ultimately

4    required her to shoot Naharro is irrelevant to Defendants' motion for summary judgment on

5    Plaintiffs' Fourth Amendment claim.

6         **3.    Conclusion**

7    Plaintiffs have failed to meet their burden of producing evidence showing a genuine issue

8    of material fact.  *See Nissan*, 210 F.3d at 1103.  Applying the three-step approach set forth in

9    *Glenn*, the undisputed evidence shows that while Galan's intrusion on Naharro's Fourth

10   Amendment rights was severe (step one), the government had an extremely strong interest in the

11   use of deadly force given the immediate threat that Naharro posed to the safety of Galan and the

12   other deputies (step two).  Balancing the gravity of the intrusion on Naharro's rights against the

13   government's need for that intrusion (step three), the undisputed evidence establishes that Galan

14   had probable cause to believe that her life was in danger at the moment she fired on Naharro.

15   Consequently, the government's interest in the use of deadly force outweighed even the ultimate

16   intrusion on Naharro's rights in this case.  *See Sheehan*, 135 S. Ct. at 1775 (officers' use of deadly

17   force was reasonable to defend against woman approaching with knife).  Defendants therefore are

18   entitled to summary judgment on Plaintiffs' claim for excessive force in violation of the Fourth

19   Amendment.  *See Celotex*, 477 U.S. at 323.

20   The death of Plaintiffs' mother was terribly unfortunate.  However, "[e]very loss of life

21   hurts, but not every loss of life violates the Fourth Amendment."  *Moore*, 2016 WL 6024530, at

22   *3.  The undisputed evidence in the record paints a chilling picture of deputies confronted with a

23   woman who chased them with a knife, ignored at least two orders to drop the knife, and

24   approached Galan while raising the knife in her direction.  Galan, like others who interacted with

25   Naharro earlier in the evening, reasonably feared for her safety.  Based on the admissible evidence

26   in the record, and even drawing all reasonable inferences in Plaintiffs' favor, the Court GRANTS

27   summary judgment for Defendants on Plaintiffs' Fourth Amendment claim.

28

United States District Court
Northern District of California

1

## B.    Wrongful Death Claim

2       Plaintiffs claim that Galan acted negligently when responding to the 911 call and that

3   Naharro died as a result of Galan's negligence.  Specifically, Plaintiffs assert that Galan failed to

4   follow police procedures regarding lighting the scene, keeping an adequate distance from Naharro,

5   de-escalating the situation, and finding less-lethal ways of subduing Naharro.  Plaintiffs contend

6   that if Galan had followed proper procedures in the period leading up to the shooting, she would

7   not have found herself in a situation requiring the use of deadly force.  Plaintiffs further claim that

8   the County is vicariously liable for Galan's negligence.  Defendants seek summary judgment on

9   the wrongful death claim, asserting that the undisputed facts establish that Galan was not

10  negligent.  The Court concludes that, viewing the evidence in the light most favorable to Plaintiffs,

11  triable issues of material fact preclude summary judgment on the wrongful death claim.

12      "Except when otherwise provided by law, public employees in California are statutorily

13  liable to the same extent as private persons for injuries caused by their acts or omissions, subject

14  to the same defenses available to private persons."  *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622,

15  628-29 (2013) (citing Cal. Gov't Code § 820).  "Also, public entities are generally liable for

16  injuries caused by the negligence of their employees acting in the scope of their employment."  *Id.*

17  at 629 (citing Cal. Gov't Code § 815.2).  "Finally, close relatives and dependents of a negligently

18  killed person can recover damages for their loss."  *Id.* (citing Cal. Civ. P. Code § 377.60).

19      In order to establish liability for negligence, a plaintiff must show that the defendant had a

20  duty to use due care, breach of that duty, and resulting injury.  *Hayes*, 57 Cal. 4th at 629.  "[P]eace

21  officers have a duty to act reasonably when using deadly force."  *Id.*  That duty "extends to the

22  totality of the circumstances surrounding the shooting, including the officers' preshooting

23  conduct."  *Id.* at 638.  State negligence law, which considers *all* of the circumstances surrounding

24  any use of deadly force, thus is broader than federal Fourth Amendment law, which focuses

25  narrowly on the moment when deadly force is used.  *Id.* at 639.  Under these standards, "[l]aw

26  enforcement personnel's tactical conduct and decisions preceding the use of deadly force are

27  relevant considerations . . . in determining whether the use of deadly force gives rise to negligence

28  liability."  *Id.*

United States District Court
Northern District of California

### 1.    Defendants' Evidence

As the moving parties, Defendants have the initial burden to produce evidence negating an essential element of Plaintiffs' wrongful death claim or to show that Plaintiffs do not have enough evidence of an essential element of that claim to carry their ultimate burden of persuasion at trial. *See Nissan*, 210 F.3d at 1102.  Under the standards articulated above, Defendants may satisfy this burden by showing that Galan acted reasonably in using deadly force against Naharro.  In making that showing, Defendants must account for *all* of the circumstances leading up to the shooting. Whereas the law on reasonableness in the context of a Fourth Amendment claim focuses on the moment when deadly force is used, the law on reasonableness in the context of a state negligence claim considers all of the circumstances leading up to the fatal moment as well as the circumstances surrounding the fatal moment itself.  *See Hayes*, 57 Cal. 4th at 639.

Defendants submit the declaration of Robert Fonzi, an expert on police practices.  *See* Fonzi Decl., ECF 67.[7]  Fonzi opines that the record in this case contains "no evidence that shows that the [sic] Deputy Galan or any of the other deputies acted inconsistently with standard police practices in their perception or reaction, or that they otherwise engaged in excessive force and/or improper police tactic/procedures in violation of standard police practices." *Id.* ¶ 20.  Fonzi also opines that Galan, Espinosa, and Brown "followed appropriate state law, department policies, tactics, escalation of force principles, and the training guidelines taught statewide by P.O.S.T." *Id.* ¶ 21.  Fonzi's declaration is sufficient to meet Defendants' initial burden, as it demonstrates that Galan's use of deadly force was consistent with police standards and state law and thus did not breach Galan's duty of care.

### 2.    Plaintiffs' Evidence

Plaintiffs controvert Fonzi's declaration with the declaration of their own police

---

[7] Defendants submitted Fonzi's declaration with their reply brief.  "Where new evidence is presented in a reply to a motion for summary judgment, the district court should not consider the new evidence without giving the non-movant an opportunity to respond." *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) (internal quotation marks, citation, and alteration omitted). However, Plaintiffs did not request an opportunity to address the Fonzi declaration, either in writing or at the hearing conducted on September 22, 2016.  Accordingly, the Court has considered the evidence.

United States District Court
Northern District of California

procedures expert, Roger Clark.[8]  Clark opines that Galan failed to conform to police practices and standards in a number of ways, including failing to de-escalate the situation, failing to use adequate lighting, and failing to gain time and distance from Naharro so that less-lethal means of subduing her could be found.  Clark Decl. ¶ 20, ECF 65-4.  Clark concludes that Galan's conduct, along with that of Espinosa and Brown, "fell below general police practices, and provoked a dangerous situation such that Deputy Galan used excessive force when she would not have needed to do so had her actions complied with the general police practices and standards."  *Id.* ¶ 21. Clark's opinion directly controverts the opinion of Defendants' expert, Fonzi, on the critical issues of whether Galan's conduct breached her duty of care and whether such breach resulted in Galan's use of excessive force.

### 3.    Conclusion

The parties have presented the Court with a classic "battle of experts" which creates disputed facts as to essential elements of Plaintiffs' wrongful death claim.  The Court therefore DENIES Defendants' motion for summary judgment on Plaintiffs' wrongful death claim.

## IV.    ORDER

Defendants' motion for summary judgment is GRANTED as to Plaintiffs' Fourth Amendment claim and DENIED as to Plaintiffs' wrongful death claim.

Dated:  October 26, 2016

_____
BETH LABSON FREEMAN
United States District Judge

---

[8] Clark's declaration actually was submitted before Fonzi's declaration, as Fonzi's declaration was filed with Defendants' reply brief.

United States District Court
Northern District of California